**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
M.W., individually and on behalf of H.W.,

                  Plaintiff,

                                  **COMPLAINT**
                                  **ECF Case No. 25-cv-6775**

         -against-

Roslyn Union Free School District,

                  Defendant.
------------------------------------------------------------------X

       Plaintiff M.W., individually and on behalf of her son, H.W., by their attorney, Thivierge &

Rothberg, P.C., as and for their Complaint, hereby alleges and states the following:

### PRELIMINARY STATEMENT

1.   Plaintiff H.W., individually and on behalf of her child, M.W., brings this action pursuant

    to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §

    1400 *et seq.*, the pertinent implementing regulations promulgated under the Code of

    Federal Regulations, § 300.342, *et seq.*, Article 89 of the New York State Education Law,

    Section 504 of the Rehabilitation Act of 1973, and Part 200, *et seq.*, of the Commissioner

    of Education's Regulations, against the Defendant, the Board of Education of the Roslyn

    Union Free School District ("District").

2.   M.W. seeks review and reversal of State Review Officer ("SRO") Carol H. Hauge's

    Decision dated August 8, 2025[1] ("SRO Dec."), which reversed Impartial Hearing Officer

    ("IHO") Sharyn Finkelstein's Findings of Fact and Decision dated December 14, 2024[2]

---

[1] A true copy of the SRO Decision, *Application of the Board of Education of the Roslyn Union Free School District*, Appeal No. 25-042 is annexed hereto as Exhibit A.

[2] A true copy of the IHO Decision for this matter is annexed hereto as Exhibit B.

("IHO Dec."). The SRO Decision erroneously found that the District offered H.W. a free and appropriate public education ("FAPE") for the ten-month 2022-2023 school year ("22-23 SY") and denied M.W.'s request for tuition reimbursement for H.W.'s placement at the Windward School ("Windward").

3.  In the 22-23 SY, H.W. was an eight year old boy diagnosed as having dyslexia, dysgraphia, and Attention Deficit Hyperactivity Disorder ("ADHD"). (Exs. 3, p. 5; 4, pp. 8-9; Tr. 223, 303, 359).

4.  For the 22-23 SY, the District offered H.W. placement in a general education classroom with 80 minutes of consultant teacher services daily, a 5:1 reading class daily, small group speech therapy 2x30, and individual occupational therapy 1x30. (*See* Ex. 5). The recommendation was similar to the program where H.W. regressed when last attending a District program, and was much larger and less supportive than the program H.W. attended in the 2020-2021 school year ("20-21 SY") at Windward.

5.  The District's program recommendation was completely inappropriate for H.W. given his reading needs and deficits, including attention deficits. H.W. was unable to learn to read for years in the District program, yet the District repeatedly failed to offer him a special education class or appropriate specialized reading instruction that could address his needs.

## JURISDICTION AND VENUE

6.  This Court, pursuant to 20 U.S.C. § 1415(i)(2)(A), 28 U.S.C. § 1331, and 28 U.S.C. § 1367, has jurisdiction over this action without regards to the amount in controversy.

7.  Venue is proper pursuant to 28 U.S.C. § 1394(b) in that Plaintiffs M.W., H.W., and the Defendant District all reside in or are situated within this judicial district.

## THE PARTIES

8. M.W. and her son H.W. are not expressly named herein by their given names, or further identified by their actual addresses within the Eastern District of New York, because of privacy guarantees provided in the IDEA, as well as in accordance with the Family Educational Rights Privacy Act ("FERPA"), 20 U.S.C. § 1232(g); 34 C.F.R. § 99.

9. At all relevant times pertaining to this action, M.W. and H.W. were and are residents of the State of New York in Nassau County, residing at an address within the boundaries of the District.

10. Defendant, the District, upon information and belief, is a duly constituted school district organized under the laws of the State of New York, and is the agency charged with the obligation to provide H.W. with a FAPE in accordance with IDEA mandates.

## RELIEF BEING SOUGHT

11. Plaintiffs seek a determination that (a) the SRO erroneously held that the District provided H.W. with a FAPE for the 22-23 SY; (b) the District failed to properly appeal the issue of H.W.'s unilateral placement at Windward, and the IHO correctly held that H.W.'s placement at Windward was appropriate for him; (c) ) the District failed to properly appeal the issue of equitable considerations, and the IHO correctly found that equitable considerations support M.W. and H.W.; (d) the District should reimburse M.W. for H.W.'s tuition at Windward; and (e) M.W. and H.W. are entitled to any other, further, and different relief the Court deems appropriate under the circumstances.

12. Pursuant to the IDEA and New York State Education Law, all school districts within New York State are required to offer eligible students with disabilities educational programs tailored to meet these students' individual needs, and to provide each such student with a

FAPE through an Individualized Education Program ("IEP"). Parents have separate statutory entitlements that are tied directly to their child's right to receive a FAPE. The FAPE requirements under the IDEA and the New York State Education Law are different for each child, and a "one size fits all" approach is not accepted. *F.L. v. Bd. of Educ. of Great Neck U.F.S.D.*, 274 F. Supp. 3d 94, 110 (E.D.N.Y. 2017), *aff'd sub nom. F.L. v. Bd. of Educ. of Great Neck Union Free Sch. Dist.*, 735 F. App'x 38 (2d Cir. 2018)*, (citing Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 859 (6th Cir. 2004)).

13.   A District may be ordered to reimburse a parent for private educational expenses obtained for a child if the District's services were inadequate or inappropriate ("Prong I"), the services selected by the Parent were appropriate ("Prong II"), and equitable considerations support the Parent's claims ("Prong III"), in what is called the Burlington/Carter test. *Sch. Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359 (1985); *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993).

14.   The Supreme Court has found that Congress intended for such reimbursement to be available as a remedy for parents when the school district failed to offer the student a FAPE. "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance," had the District offered the student a FAPE. *Burlington*, 471 U.S. at 370-71.

15.   In New York State, there is a two-tier administrative due process review. A parent who believes that an IEP is insufficient may challenge it at a hearing before an IHO. 20 U.S.C. § 1415(f); N.Y. Educ. L. § 4404(1)(a). "At that hearing, the school district has the burden of demonstrating the appropriateness of its proposed IEP." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003). The IHO's decision may be appealed to an SRO,

and the SRO's findings may in turn be challenged in either state or federal court. *Id.* at 380 (*citing* 20 U.S.C. § 1415(g), (i); N.Y. Educ. L. § 4404(2)); *see also* N.Y. Educ. L. § 4404(1)(c).

16. The District Court "conducts a 'modified de novo' review of the administrative proceedings," and is charged with making an independent decision based on the preponderance of the evidence developed at the administrative proceedings, and any other evidence presented by the parties. *See M.N. v. N.Y. City Dep't. of Educ.*, 700 F.Supp.2d 356, 363-364 (S.D.N.Y. 2010); *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122-123 (2d Cir. 1998). The Court does not "rubber stamp" administrative decisions, but rather, is expected to give "due weight" to the factual determinations made during the state administrative process. *Walczak,* 142 F.3d at 129; *see Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982). The Court has "broad authority to grant 'appropriate' relief, including reimbursement for the cost of private special education where a school district fails to provide a FAPE." *Forest Grove School Dist. v. T.A.,* 557 U.S. 230, 239 (2009).

17. In an action involving rights provided by IDEA, the District Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see M.S. v. N.Y. City Dep't of Educ.,* 231 F.3d 96, 102 (2d Cir. 2000).

## FACTUAL BACKGROUND

18. As noted, at the start of the 22-23 SY, H.W. was an eight-year-old student with a disability, whose IEP classified him as having a Learning Disability. Ex. 5, p. 1.

19. H.W. presents with dyslexia, Attention Deficit Hyperactivity Disorder ("ADHD") and dysgraphia. (Exs. 3, p. 5; 4, pp. 8-9; Tr. 223, 303, 359). He was previously diagnosed as having speech-sound disorder and language disorder and struggled with reading from a young age. (Ex. R, p. 8; Tr. 312-13).

20. While attending recommended District programs in general education programs with consultant teacher services in the past, H.W. regressed and was unable to learn to read. *See Cerra v. Pawlings Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (requiring that school districts afford a student with "an opportunity greater than mere trivial advancement.").

21. Dr. Herman M. Davidovicz, Ph.D., ABPP, evaluated H.W. in March 2021. (Ex. 3, p. 1). H.W. attained a Full-Scale IQ score of 102, at the 55th percentile, on the Wechsler Intelligence Scale for Children-Fifth Edition ("WISC-V"). (Ex. 3, p. 2). H.W.'s Processing Speed was in the "bright normal" range at the 90th percentile. (*Id.*). However, he demonstrated significant difficulty on tests of word retrieval and he struggled with speech articulation. (Ex. 3, p. 3). Dr. Davidovicz reported that H.W. was restless and "almost always easily distracted," requiring refocusing even in a 1:1 testing environment. (Ex. 3, pp. 3-5). Dr. Davidovicz diagnosed H.W. with dyslexia, ADHD, and dysgraphia. (Ex. 3, p. 5-6).

22. In March 2021, H.W. was receiving reading instruction in-District using the Fundations program. (Ex. 3, p. 5). He was also placed in a general education District class with the support of daily Resource Room (40 minutes daily) and daily consultant teacher services (40 minutes daily). (Ex. 3, p. 1). Noting H.W.'s "apparent difficulty." Dr. Davidovicz reported that with in-District programming, H.W.'s "progress has not been substantial" and "it is equally apparent that there has been <u>no</u> good generalization to functional skills." (Ex.

3, p. 6)(emphasis added).

23. Dr. Davidovicz noted that "alternative multi-sensory programs…may need to be considered." (*Id.*).

24. Further, he recommended, *inter alia*, that a "coteaching" class be considered and that reading instruction be "performed daily with intensity which can only happen if it is done individually or in a very small group of children with similar needs and functional abilities." (*Id*).

25. Initially, M.W. hired Dr. Davidovicz to provide the evaluation. (Tr. 332). At that time, Dr. Davidovicz told M.W. by phone that H.W. "needed a small group instruction and that Roslyn wouldn't be a good fit for H.W. He needed more attention and he needed a smaller group setting. He also needed a sensory based reading program." (Tr. 333).

26. Dr. Davidovicz changed his recommendation after the District paid for the evaluation and made a different recommendation at the CSE meeting than he had on the phone with the parent. (Tr. 333-34).

27. The IHO held that M.W. "credibly testified" regarding the initial recommendations Dr. Davidovicz had made to M.W. by phone and that Dr. Davidovicz's written report did not reflect those recommendations, and this finding is entitled to deference. (IHO Dec., p. 14).

28. Generally, an SRO should defer to the credibility findings of an IHO, unless non-testimonial evidence in the hearing record justifies a contrary conclusion or the hearing record, read in its entirety, compels a contrary conclusion. *M.W. v. New York City Dep't of Educ*., 869 F. Supp. 2d 320, 330 (E.D.N.Y. 2012), *aff'd*, 725 F.3d 131 (2d Cir. 2013)(*citing Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 529 (3d Cir.1995)).

29. Although the District did not recommend smaller class instruction following Dr.

Davidovicz's evaluation, it did begin to offer H.W. instruction using an evidence-based reading methodology, the Wilson Reading ("Wilson") program. (Tr. 321).

30.  H.W. underwent a Language/Literacy Evaluation with Dr. Diane Slonim, SLP, Ph.D., on July 25, 2021. (Ex. D). Dr. Slonim reviewed H.W.'s prior testing as well as conducting her own assessment of his language skills. (Ex. D, pp. 1-2). Overall, Dr. Slonim concluded that in the District program, which was then providing instruction via Wilson, H.W. had demonstrated a "severe lack of progress in reading" and was severely delayed below grade level. (*See* Ex. D, p. 4; Tr. 321).

31.  In addition to delays in reading and writing, H.W. also demonstrated difficulty with spoken language, showing multiple errors in morphosyntax and subject-verb agreement during conversation to an extent atypical for a student of his age. (Ex. D, p. 5). Dr. Slonim found, *inter alia*, that H.W. required monitoring of social/emotional challenges related to reading instruction and intensive daily 1:1 instruction using a multisensory reading program taking into account his "emotional reaction to failure" and the pace at which he could learn. (Ex. D, pp. 4-5).

32.  Private tutors hired by M.W. were similarly unable to help H.W. progress using Wilson. (Tr. 313-14).

33.  Pursuant to a settlement agreement with the District, H.W. attended Windward in the 21-22 SY. (Ex. 2). At Windward, H.W. was placed within a program that emphasized language-based instruction throughout the school day. (Tr. 369). Sensory-based reading and language instruction was built into all instruction throughout the school day. (Tr. 322). Staff utilized instructional methodologies such as Preventing Academic Failure ("PAF"), an Orton-Gillingham-based reading program. (Tr. 209-10).

34. Prior to starting at Windward, while in-District, H.W. "couldn't read. He couldn't work out any words." (Tr. 313-14).

35. The District school psychologist who evaluated H.W. conceded at hearing that despite receiving Wilson instruction in-District, H.W. could not read when he left the District and before starting at Windward. (Tr. 148).

36. During his first year at Windward in the 21-22 SY, H.W. made "significant growth" and was able to read and participate academically. (Tr. 314). He showed gains in his understanding of spelling rules, handwriting skills, writing sentences, and self-checking of grammatical issues in spoken and written sentences. (Ex. Q, p 1).

37. H.W. was evaluated by Dr. Rebecca Fontanetta, Psy.D., across three dates in April and March 2022. (Ex. 4, p. 1).

38. Dr. Fontanetta reported that H.W. continued to evince performance anxiety when asked to perform reading and writing tasks. (Ex. 4, p. 5; Tr. 347).

39. Dr. Fontanetta's testing noted that H.W. had significant deficits in reading decoding, reading fluency, written expression, spelling, and reading comprehension. (Ex. 4, p. 8). However, her testing also revealed progress H.W. had made at Windward, including increasing his reading rate from the 5th percentile (in 2021 District testing) to the 16th percentile on the Gray Oral Reading Test, Fifth Edition ("GORT-5). (*Compare* Ex. B, p. 9 *with* Ex. 4, p. 7).

40. Dr. Fontanetta also administered the Comprehensive Test of Phonological Processing, Second Edition ("CTOPP-2"), which reflected that H.W. was then approaching age-level skills with phonological processing, a "notable improvement" over his scores on the CTOPP-2 in-District in 2021. (*Id.*). His Elision skills, or breaking down words into their

individual morphemes and phonemes, increased from the 16th percentile to the 25th percentile. (*Id.*) H.W.'s ability to combine morphemes and phonemes together to create complete words ("Word Blending") increased from the 25th percentile (2021) to the 63rd percentile (in 2022). (*Id.*). Dr. Fontanetta testified that word blending was an area that showed the quickest response to appropriate academic reading remediation. (Tr. 357).

41. Overall, Dr. Fontanetta noted that H.W.'s academic skills were clustered at the first grade level, indicating that he remained below grade level but had progressed towards closing the gap during his year at Windward. (Ex. 4, p. 8; *see* Tr. 382). She concluded that H.W.'s ability to use the skills he had learned was still somewhat impaired by variable functioning within attention and executive functioning. (Ex. 4, p. 8; Tr. 223, 348).

42. Dr. Fontanetta recommended, *inter alia*, that H.W. required placement in a language-based classroom setting with a small student to teacher ratio with significant supports and daily specialized multisensory reading instruction with a reading specialist and empirically-validated treatment program throughout the school day. (Ex. 4, p. 9). Dr. Fontanetta further testified that given research into the needs of students with dyslexia and the combination of H.W.'s deficits (including reading and attention), H.W.'s unique needs necessitated placement in a small class size of approximately 8 students. (*See* Tr. 361).

43. Dr. Fontanetta did not recommend speech therapy for H.W. as he no longer met criteria for a language disorder or speech sound disorder. (Exs. 4, p. 9; R, p. 8; Tr. 434).

44.  The District convened a CSE meeting on June 7, 2022, to develop H.W.'s 22-23 IEP. (Tr. 23; Ex. B, p. 1). M.W. participated in this meeting, chaired by Barbara Schwartz, District Director of Pupil Personnel and Special Education. (Tr. 13, 23, 315).

45. Lara Damashek, Windward CSE liaison, participated in the meeting to share a progress

report about H.W., and Dr. Fontanetta described her recent evaluation of H.W. (Tr. 315-17). Ms. Damashek answered all of the District's questions about H.W. (Tr. 316).

46. Ms. Damashek described H.W.'s progress with PAF, including his improved decoding skills, math skills, spelling, paragraph writing, and handwriting skills. (Exs. B, p. 2; Q, p. 1; Tr. 147). She also discussed the progress H.W. made with and as a result of Windward's handwriting-focused programming. (Ex. Q, p. 1). H.W. had progressed to Level 109/110 of PAF, having been on Level 80 in February 2022 when the CSE had last met. (Ex. B, p. 2). The District's speech pathologist concurred that H.W. was making progress in his language skills at Windward in a small class ratio. (Ex. Q, p. 1).

47. During the meeting, M.W. reiterated her concerns that the use of text-to-speech assistive technology would operate as a crutch for H.W. and would decrease his willingness to work on reading and writing himself. (Ex. B, p. 2). H.W. already had a history of struggling to engage with efforts to teach him to decode after years of enduring inappropriate instructional methods from the District. (*See* Tr. 312-13; Ex. 4, p. 5).

48. M.W. requested that the District consider placement at Windward as H.W. was finally making progress and succeeding in learning to read there, but the District refused and ignored the concerns about H.W.'s distractibility, dyslexia, and need for a small class program. (*See* Tr. 369; Exs. Q, p. 1; 4, p. 8). The District failed to recommend a special education class or appropriate reading instruction for H.W., instead repeating its previous recommendation that he be placed in an inappropriate General Education class with 80 minutes of consultant teacher services. (*See* Tr. 316-17).

49. The District briefly mentioned its in-District 12:1:1 class but determined that the class lacked appropriate peers for H.W. and ultimately did not recommend it. (Ex. 6, p. 2).

50. At the conclusion of the CSE, the District recommended that H.W. receive 80 minutes of consultant teacher services daily, a 5:1 reading class daily, small group speech therapy 2x30, and individual occupational therapy ("OT") 1x30. (Ex. B, p. 16).

51. The consultant teacher would be in the classroom to work with a group of students, not individually with H.W. (Tr. 187).

52. A classroom "Teacher Assistant" was mentioned briefly and vaguely in the comments section of the proposed IEP, but there was no mention of this support in the proposed IEP recommendations. (Ex. 5, pp. 1, 16-17).

53. Despite the concerns M.W. had raised many times, the District recommended that H.W. receive reading instruction using the Wilson Reading program, which was inappropriate and ineffective for H.W. (Tr. 321-22).

54. Dr. Fontanetta noted at the CSE that the District's recommendation was inappropriate for H.W. given his disability and needs. (Tr. 318).

55. M.W. was "shocked" by how minimal the recommendations were, and concerned that the District did not understand the extent of H.W.'s needs. (Tr. 319, 321). M.W. also raised concerns about the peers H.W. would be grouped with, but the District refused to share even basic information such as the classifications of these students. (Tr. 317).

56. M.W. did not receive a class profile describing the proposed class until the exchange of evidence disclosures for her son's hearing, despite requesting this information. (Tr. 317-18). M.W. was also concerned that H.W. would regress emotionally in the proposed placement, as he had previously been bullied for his reading deficits in the District program. (Tr. 321).

57. By letter dated August 22, 2022, M.W. wrote to the District expressing her concerns about

placing H.W. in the District's recommended general education program. (Ex. Q). She gave proper notice that subject to an appropriate program recommendation, she would continue to send H.W. to Windward for the 22-23 SY and seek payment from the District. (*Id.*).

58. Absent appropriate recommendations from the District, M.W. returned H.W. to Windward which offered small supportive classes and intensive specialized reading instruction, after M.W. provided the District with proper written notice of her concerns with the District program. (Tr. 319; Ex. Q).

59. At Windward, H.W. received sensory-based, language-focused instruction throughout the school day and across all subjects. (Tr. 322). During his time at Windward, H.W. made "significant growth" and was able to read and participate academically. (Tr. 314).

60. Ms. Schwartz and District psychologist Maria Stathakos observed H.W. at Windward in an ELA class on March 1, 2023. (Ex. 7; Tr. 20-21). Ms. Schwartz is not mentioned in the observation report, which was drafted by Ms. Stathakos. (Ex. 7).

61. When they observed, H.W.'s class at Windward was working on a new letter blending skill, and with prompting from the teacher H.W was able to accurately blend words using the new rule. (Ex. 7).

62. H.W. responded well to Windward's small-class, tailored multi-sensory curriculum, and he progressed meaningfully academically, emotionally, and socially. (Tr. 319-20, 322-23).

63. Dr. Fontanetta re-evaluated H.W. on May 26, 2023, noting that he continued to have significant reading and writing delays. (Ex. R, p. 7). However, she noted that he was "clos[ing] the gap somewhat over the past year" at Windward. (*Id.*). He also demonstrated improved task persistence and significant improvement in his speech articulation. (Tr. 373-74; Ex. R, p. 4).

64. Testing using the GORT-5 revealed that compared to 2022, H.W. had progressed in his reading accuracy, going from a raw score of 0 to 8, and his capacity to complete reading tasks had improved. (Ex. R, p. 13; Tr. 225, 291-92, 378). Dr. Fontanetta noted that this increase was "very significant" for H.W. (Tr. 418-19). He had not progressed as quickly as typically developing students, but this was to be expected for a student with his needs and he was making progress over time. (Tr. 292, 379-80).

65. Dr. Fontanetta also repeated her administration of the Oral and Written Language Scales, Second Edition ("OWLS-2"), revealing that he had improved in his reading comprehension (Ex. 4, p. 13; Tr. 226, 381). This was even more notable given that the OWLS-2 testing was a significantly more challenging problem set in 2023 as H.W. had aged. (Ex. 4, p. 8; Tr. 381).

66. H.W. also demonstrated progress on the Process Assessment of Learning, Second Edition ("PAL-2"), reading words notably faster than he had been able to previously. (Ex. 4, pp. 12-13; Tr. 226-27, 294).[3] CTOPP-2 testing also demonstrated that H.W. was progressing and able to complete more testing items related to phonological awareness, a foundational reading skill. (Tr. 227, 294; Ex. R, p. 12).

67. Overall, in almost all areas he was making slow and steady progress compared to his own prior scores. (Tr. 290-95, 382).

68. Dr. Sarah Rendell, Ph.D., a former Windward employee and licensed clinical psychologist with a background in childhood education and neuropsychology, reviewed H.W.'s reports and evaluations, and was familiar with him and his class from her time working at

---

[3] Unlike most tests which give a number of correct responses as a raw score, the results of the PAL-2 raw scores represent the amount of time it took H.W. to complete the task. (Tr. 416). Therefore H.W.'s raw score on, for example, Rapid Automatic Naming-Words going from a 75 to a 60 represents an improvement. (Ex. R, p. 12; Tr. 416, 446).

Windward. (*See* Tr. 202, 216).

69. Dr. Rendell provided an expert opinion that H.W. required more support and appropriately paced instruction than he could receive in a general education class. (*See* Tr. 239). Given the intensity of his needs, he required a supportive classroom environment that could not be provided in a classroom only supported by another teacher for 80 minutes per day. (Tr. 239-40).

70. On October 12, 2023, M.W. filed a due process hearing complaint alleging that the District had failed to provide H.W. with a FAPE for the 22-23 SY.

71. Following an impartial hearing, the IHO correctly held that the District failed to offer H.W. a FAPE. The IHO also found that H.W.'s program at Windward was appropriately tailored to his needs and that he had progressed there, and that equities favored M.W. and H.W. Based on these findings, the IHO awarded tuition reimbursement to M.W. and H.W.

72. The District appealed the IHO's Decision to the New York State Office of State Review. Unfortunately, and erroneously, the SRO upheld the District's appeal, in a Decision which was conclusory; was not supported by the record or law; misstated the record; failed to reconcile conflicting testimony and evidence; and failed to address several significant issues.

**LEGAL CLAIMS**

73. The SRO Decision is not supported by testimony, evidence, or applicable law and review standards. The SRO failed to engage in a thorough and careful review of the testimony and evidence in the record and produced a Decision that was inadequately reasoned. Overall, the SRO Decision should not receive deference here.

74. Moreover, the SRO Decision does not turn on educational expertise such that deference is warranted. *De novo* review compels a finding that the District denied H.W. a FAPE.

75. The District failed to develop a procedurally and substantively appropriate IEP for H.W., which was calculated to enable him to receive educational benefits, for the 22-23 SY.

76. The SRO improperly disregarded the IHO's findings regarding H.W.'s skills and levels, inaccurately affirming the District's IEP recommendation that H.W. could progress in a general education setting with consultant teacher support.

77. To be appropriate, the IEP must provide for the student "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007)*. If the student's unilateral programming is appropriate, "[s]ubstantive inadequacy automatically entitles the parents to reimbursement." *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir 2012). As discussed, *infra*, the District failed to comply with the requirements of the IDEA and the New York State Education Law in developing H.W.'s IEP and denied him a FAPE.

78. At the time of this placement recommendation, H.W.'s skills were "clustered at approximately the first-grade level." (Ex. 4, p. 8). A general education class would have been teaching material at the third grade level, far above what H.W. could access. (*See* Ex. B, p. 1).

79. The SRO fails to contend with evidence showing consensus that providing H.W. with instruction in a classroom with students on a higher level would be academically and emotionally regressive for him.

80. Dr. Davidovicz noted that H.W. "should not be given any tasks in reading, writing, or copying that are beyond his functional level so as to avoid frustration during independent classroom tasks and for homework." (Ex. 3, p. 7).

81. Dr. Slonim found, *inter alia,* that H.W. required monitoring of social/emotional challenges related to reading instruction taking into account his "emotional reaction to failure" and the pace at which he could learn. (Ex. D, pp. 4-5).

82. Dr. Fontanetta reported that H.W. continued to evince performance anxiety when asked to perform reading and writing tasks even after improvement in his skills at Windward. (Ex. 4, p. 5; Tr. 347).

83. The IHO's decision that H.W. couldn't progress in a general education class was not based solely on his grade level equivalent scores, which the SRO overemphasizes in a Decision that places undue weight on out of state administrative decisions.[4] (SRO Dec., p. 15 fn. 18; IHO Dec., pp. 18-19, 23; Tr. 228). The IHO also relied on expert testimony and noted that it was a significant concern to Dr. Fontanetta and Dr. Rendell that H.W. could not learn at the rate or pace of general education students, which would necessarily cause him to fall further behind as the year went on and negatively impact him emotionally and academically. (IHO Dec., pp. 18-19, 23; Tr. 228, 239, 330; 376).

84. The District school psychologist testified that H.W. was learning with "a slower rate of progress and ability to generalize those skills [than typical students]." (Tr. 132-33). It was unclear how he could access instruction in a general education program with students who were learning at a much faster rate than he was, and the District failed to consider how the transition into a general education class would work for H.W. (IHO Dec., p. 19).

---

[4] The SRO fails to note that Windward staff also reported that H.W.'s skills were clustered around the first grade level. (Tr. 125).

85.   The IHO properly found that the District's failure to make recommendations for H.W.'s proposed transition into a significantly larger class size deprived H.W. of a FAPE. (IHO Dec., pp. 18-19). The SRO mentions this finding by the IHO but fails to meaningfully rebut it, instead restating the insufficient management needs in the proposed IEP. (SRO Dec., pp. 19-20).

86.   The SRO failed to consider the District's inappropriate peer grouping for H.W. Districts must place students with disabilities in classes with peers of "similar individual needs." 8 N.Y.C.R.R. § 200.6(h). *See J.F. v. N.Y. City Dep't of* Educ., 2013 WL 1803983, at *2 (S.D.N.Y. Apr. 24, 2013)(upholding a parental challenge to a classroom based on students' profiles). Here, H.W.'s IQ had been assessed by Dr. Davidovicz to be 102, higher than any of the other students in the proposed classes. (Exs. 3, p. 2; 11). Dr. Rendell testified that almost all the students in the class profile would not be capable of learning the same material as H.W., with some of their scores falling in the impaired range. (Tr. 243-44).

87.   None of the other students in the proposed classroom for H.W. had dyslexia, and none of the students in his reading class were also in his regular classroom. (Tr. 149).

88.   The District psychologist testified that it would be inappropriate to group students whose scores were more than two standard deviations apart, which she defined as having a standard score of more than 20 points apart. (Tr. 144). The IQ range of the IEP students receiving consultant services in H.W.'s class ranged from 66 to 100, more than 30 points from each other. (Ex. 11). Two students in that group had IQ standard scores more than 20 points below H.W.'s score of 102. (Ex. 11). Dr. Fontanetta agreed that the students in question were not appropriate peers for H.W. given the discrepant intellectual functioning scores. (Tr. 371).

89.    The discrepancy in intellectual functioning would be particularly inappropriate here as all students in the class would have started the reading programming at the same level and pace. (Tr. 184-85). Dr. Rendell testified that students at such different levels would have to move at different paces. (Tr. 244). In addition, the students in the class had a wide range of reading comprehension scores (although the class profile does not indicate how these scores were reached). (Ex. 11). Ms. Oliver testified that if a student couldn't stick to the pace in her classroom for reading instruction, they would have "a meeting to see if we needed to make different recommendations…to make [a new] program" for the child. (Tr. 184). Her testimony demonstrated that the class recommended for H.W. could not be individualized to his needs. Dr. Fontanetta also expressed concern that there was too large an IQ discrepancy for H.W. to be appropriately placed. (Tr. 370-71).

90.    The SRO made rulings regarding issues that the District failed to raise in its appeal, thereby barring those issues from consideration. For example, neither the District's Request for Review nor accompanying Memorandum of Law challenge the IHO's findings on H.W.'s skills clustering at the first grade level or the use of grade equivalent scores.

91.    The SRO inaccurately claimed that the IHO did not rule on predetermination of H.W.'s placement. (SRO Dec., p. 9 fn. 11). This Court should not defer to the SRO's inaccurate holding that the District did not predetermine H.W.'s placement, as "[t]he issue of predetermination is not a matter requiring educational expertise." *A.K v. Westhampton Beach Sch. Dist.*, No. 17-CV-0866 (GRB)(SIL), 2021 WL 621236, at *14 (E.D.N.Y. Jan. 6, 2021), *report and recommendation adopted sub nom. Killoran v. Westhampton Beach Sch. Dist.*, No. 2:17-CV-00866, 2021 WL 665277 (E.D.N.Y. Jan. 25, 2021).

92. Although she did not use the word predetermination, the IHO properly found that the District failed to consider out of District placements for H.W., despite him already attending an out of District placement, thereby demonstrating that the District did not have an open mind. (IHO Dec., p. 17). A CSE's predetermination of a child's IEP can amount to a procedural violation of the IDEA if it deprives the parent of meaningful participation in the IEP process. *J.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d, 606, 648 (S.D.N.Y. 2011). The District's failure to consider program options requested by a parent may constitute predetermination and a denial of FAPE, as it denies a parent meaningful participation in IEP development. *See E.H. v. N.Y. City Dep't of Educ.*, 164 F.Supp.3d 539, 552-553 (S.D.N.Y. 2016) (finding that the CSE predetermined a student's placement where it failed to consider more restrictive options at a parent's request).

93. Dr. Fontanetta had provided her evaluative results and recommendations to the District, including her recommendation that H.W. required placement in a small class, but the District refused to meaningfully consider more supportive options at the June CSE meeting. (*See* Ex. 4). The only alternative option allegedly considered by the District was placement in an in-District 12:1:1 special class, but this was rejected because the District lacked a 12:1:1 class with appropriate peers for H.W., not because he did not require a small class placement. (*See* Ex. 6, p. 2). The District failed to consider any out of District placements which might have offered a small class size with more appropriate peers.

94. The District was overall uncooperative with M.W. and unwilling to listen to the report being provided by Windward at the CSE meeting. (*See* Tr. 315).

95. The District cast doubt on Dr. Fontanetta's testing and credentials at the meeting without justification, and the SRO ignored the District's hostile behavior merely because the

District, by rote, repeated some of her data in the proposed IEP. (Tr. 316). District staff were so closed-minded that one testified that she did not learn "anything" from Dr. Fontanetta's report, despite the fact that Dr. Fontanetta conducted 11 tests to Dr. Davidovicz's 3, thereby generating significant data. (Tr. 31-32, 77-78; *see* Exs. 3, 4).

96.  Other concerns the District claimed to have at hearing with Dr. Fontanetta's testing were not raised at the CSE. (Tr. 148-49). Ms. Schwartz testified that these concerns were raised by the District school psychologist, but the school psychologist herself testified that she did not ask any such questions. (Tr. 79, 148).

97.  The SRO also improperly held that the issue of predetermination was waived by M.W. due to it not being identified as an issue on appeal in M.W.'s Answer to the District's Request for Review. (SRO Dec., p. 9 fn. 11).

98.  However, as M.W. had prevailed on all three Prongs of the Burlington/Carter test in the IHO's Decision, she was not obliged to appeal it even presuming that the IHO had not ruled on predetermination.

99.  The "overwhelming authority in this Circuit… has found that a non-aggrieved party's failure to cross-appeal an unaddressed issue does not constitute a waiver." *G.S. v. Pleasantville Union Free Sch. Dist.*, 2020 WL 4586895, at *16 (S.D.N.Y. Aug. 10, 2020)(collecting cases). The Court in *G.S.* directly considered one of the cases cited by the SRO here, *M.C. v. Mamaroneck Union Free Sch. Dist.*, noting that it concerned a case wherein the IHO ruled against the parents, and they were therefore aggrieved. *G.S.*, 2020 WL 4586895, at *16 (*citing* 2018 WL 4997516, at *23 (S.D.N.Y. Sept. 28, 2018).

100. The SRO's citations contending that a respondent waives an issue on which they prevailed at the IHO level by not raising it in their Answer are all unavailing. In each, issues were

waived due to being omitted by a party filing a Request for Review or filing an Answer with Cross Appeal. *See Davis v. New York City Dep't of Educ.,* 2021 WL 964820, at *11 (S.D.N.Y. Mar. 15, 2021); *Application of a Student with a Disability*, Appeal No. 19-021; *Application of the Dep't of Educ.,* Appeal No. 12-131. Here, there was no Cross Appeal as M.W. prevailed on all three prongs of the *Burlington/Carter* test at hearing and was not aggrieved.

101. Within the District's recommended class, there was no fulltime special education teacher in the room to differentiate instruction or work with H.W. to address his special education needs throughout the school day even though all third grade tasks involve some level of reading.

102. The District testified that even the other students with IEPs in the proposed classroom were performing on the average level academically, unlike H.W. (Tr. 133).

103. The IHO properly found that consultant teacher services for 80 minutes per day were not sufficient to make up for the lack of a special education small class program focused on reading instruction. (IHO Dec., p. 15).

104. District consultant teacher Tiffany Oliver testified that her attention was split between a few students in the classroom, so H.W. would not have received the full 80 minutes of allegedly "direct" support that was recommended in his IEP (Ex. B, p. 16; Tr. 186-87). There was no consistent 1:1 instruction or support available. (Tr. 165).

105. In fact, contrary to the District's claims, Ms. Oliver would provide instruction to groups that included the unclassified students in the proposed class, further diverting her attention from the students who were slated to receive "direct" services. (Tr. 168). The SRO fails to

contend with this testimony, instead blithely citing other District witnesses who claimed that Ms. Oliver "solely" worked with students in the class with IEPs. (SRO Dec., p. 14).

106. The SRO improperly credited the District's erroneous claim that the IHO's decision was based largely on her conclusion that there was no evidence that H.W. ever made progress in a general education setting. The IHO made this statement once, in a paragraph dealing only with the question of whether the District's proposed program was H.W.'s Least Restrictive Environment ("LRE"). (IHO Dec., p. 18).

107. The SRO repeatedly relies upon or refers to the written recommendations made by Dr. Davidovicz, without contending with the IHO's finding that Dr. Davidovicz had changed these recommendations after the District paid for his evaluation, which seriously undermines his credibility. (*See* IHO Dec., p. 14; SRO Dec, pp. 14, 17). Notably, Dr. Davidovicz did not testify at the hearing. (IHO Dec., p. 14).

108. Generally, an SRO should defer to the credibility findings of an IHO, unless non-testimonial evidence in the hearing record justifies a contrary conclusion or the hearing record, read in its entirety, compels a contrary conclusion. *M.W.*, 869 F. Supp. 2d at 330(*citing Scott P.,* 62 F.3d at 529).

109. There is no non-testimonial evidence in the record that contradicts the IHO's credibility determination, and the SRO fails to contend with the IHO's finding on this issue at all.

110. Effectively, the IHO found that both Dr. Davidovicz (by phone) and Dr. Fontanetta (in her report) recommended that H.W. required a smaller class setting to learn. This meant that the expert paid by the District (Dr. Davidovicz) and the expert paid by the parent (Dr. Fontanetta) had a consensus on H.W.'s need for a small class program until Dr. Davidovicz, for unknown reasons, changed his report. "[W]hen the reports and evaluative materials

present at the CSE meeting yield a clear consensus, an IEP formulated for the child that fails to provide services consistent with that consensus is not reasonably calculated to enable the child to receive educational benefits." *A.M. v. N. Y. City Dep't. of Educ¸* 845 F.3d 523, 542-45 (2d Cir. 2017); *W.S. v. City Sch. Dist. of City of N.Y.*, 188 F.Supp.3d 293, 305 (S.D.N.Y 2016).

111. The SRO improperly relies on retrospective testimony at hearing that a "Teacher Assistant" would have supported H.W. to help address his distractibility in the District program, when this service was not recommended in the proposed IEP. (Ex. 5, pp. 16-17; SRO Dec, p. 16).

112. "[T]estimony that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement" is retrospective and "may not be considered." *R.E.*, 694 F.3d at 185-86. "[T]estimony regarding state-offered services may only explain or justify what is listed in the written IEP." *Id.* at 186.

113. Parents are "entitled to rely on the IEP's characterization of the services available to [the student] in deciding whether to place [the student] in a private school setting." *P.K. ex rel. S.K. v. N.Y. City Dep't of Educ.,* 526 Fed.Appx. 135, 140-41, 141 n. 8 (2d Cir. 2013)(holding that a teacher's testimony regarding supplemental classroom language instruction could not remedy a deficient IEP which failed to recommend sufficient individual language therapy).

114. The SRO argues that consideration of the Teacher Assistant testimony is not retrospective by effectively comparing it to cases involving "clerical error." (SRO Dec., p. 16). Both cases are inapposite here.

115. In one, *M.H. v. New York City Dep't of Educ.* ("*M.H.* (S.D.N.Y. 2011)"), there were other references to the omitted counseling service throughout the IEP, it was clear that the intent

was that the student receive counseling, and "there was no dispute as to the level of counseling services recommended by the CSE." No. 10 CIV. 1042 RJH, 2011 WL 609880, at *11 (S.D.N.Y. Feb. 16, 2011). This specificity would have preserved the right of the parents to seek redress if the service had not been provided.

116. Unlike in *M.H.* (S.D.N.Y. 2011), there is no other reference to the Teacher Assistant anywhere else in H.W.'s IEP – not what support this individual would have provided to H.W., how much time they would have spent with H.W., nor even what their role was in the class as a whole. *See* Ex. 5; *see also M.H.*, 2011 WL 609880, at *11. As the Teacher Assistant support was not specifically recommended in the IEP, M.W. had no "guarantee" that H.W. would receive the support of a Teacher Assistant and could not rely on this support being available. *R.E.*, 694 F.3d at 194.

117. This goes far beyond the "clerical error" implied by the SRO and instead falls within what the Court in *R.E.* was attempting to prevent: Districts putting services on IEPs that they were free to modify at will.

118. Additionally, unlike the counseling mandate in *M.H.* (S.D.N.Y. 2011) where all parties understood how much of a support would be provided, there was no consensus or understanding of how much support the Teacher Assistant would provide to H.W. since no specifics were put in the IEP.

119. The other case quoted by the SRO, *Mason v. Carranza*, is effectively only addresses the relevant issue glancingly. (SRO Dec., p. 16). *See* No. 20-CV-4010 (PKC) (SJB), 2023 WL 6201407, at *13 (E.D.N.Y. Sept. 22, 2023), *reconsideration denied*, No. 20-CV-4010 (PKC) (SJB), 2024 WL 3624058 (E.D.N.Y. Aug. 1, 2024), *and appeal withdrawn sub nom. Mason v. Banks*, No. 23-7604, 2024 WL 5673109 (2d Cir. Nov. 7, 2024).

120.  In *Mason*, the Court found that the parents had failed to raise the issue of whether the DOE properly recommended extended school year services to the student in their initial complaint, barring it from significant consideration. *Id*. The Court affirmed the SRO that the omission of extended school year services did not rise to a denial of FAPE because the "IEP was otherwise clear that A.D. would receive 12-month, extended year services" and DOE witnesses testified that lack of clarity on this point was a "clerical error." *Id.* at 13-14.

121.  Here, there was no clarity elsewhere in the IEP and there was no testimony that the failure to recommend Teacher Assistant support was an error.

122.  Moreover, had the omission of the Teacher Assistant been an error, the District could have corrected it during the resolution period following filing of the due process complaint: the purpose of the IDEA resolution period is to ensure that parents will timely alert school districts of IEP deficiencies in their due process complaints, so that school districts which have "inadvertently or in good faith omit[ted] a required service from the IEP can cure that deficiency during the resolution period without penalty." *R.E.*, 694 F.3d at 188. When a school district fails to amend an inadequate IEP during the resolution period, the district "may not later benefit from the use of retrospective evidence – that is, evidence showing that …[the placement] would have been materially different than what was offered in the IEP." *Id*.

123.  Further, testimony about how many students would be in the proposed class or how many students the consultant teacher would be working with is retrospective and must be excluded. The proposed IEP does not identify a class size nor a group size for the consultant. (Ex. 5, p. 16). The CSE chairperson at hearing did not know how many students the

consultant teacher would be working with in H.W.'s program, and therefore this information was not available to the parent at the time of her placement decision. (*See* Tr. 29).

124. "[A]n IEP must be evaluated prospectively as of the time it was created." *R.E.,* 694 F.3d at 188.

125. The Second Circuit used an example regarding class ratios in its Decision holding that retrospective testimony was inadmissible in IDEA cases in *R.E.,* writing that "if a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this structure operates and why it is appropriate. It may not introduce evidence that modifies this staffing ratio." *R.E.*, 694 F.3d at 187.

126. Here, the District attempts to modify the class ratio offered to H.W. far too late.

127. The SRO also ignored procedural issues with the proposed IEP. For example, the consultant teacher services described at hearing did not comport with the IEP recommendations.

128. A student's "individualized education program (IEP) shall indicate the regular education classes in which the student will receive consultant teacher services." 8 N.Y.C.R.R. 200.6(d).

129. H.W. was recommended to receive consultant teacher services for "Direct Reading & Writing" but Ms. Oliver testified that part of her 80 minutes daily was focused on teaching math whereas the second subject she covered daily might be solely reading or solely writing. (Ex. B, p. 16; Tr. 160). Math was H.W.'s area of strength (Tr. 221), and he required a strict focus on reading and writing instruction, as recommended by the proposed IEP. (IHO Dec., p. 15).

130. Essentially, the District's program recommendation for H.W. was placement in a

mainstream general education class with limited consultant teacher support, despite his serious distractibility, and academic and social-emotional special education needs. (Tr. 138; IHO Dec., p. 15-16). Retrospective testimony revealed that the proposed class would have had 21-23 students in it, but it could have ranged to a much larger size. (*See* Tr. 139).

131. This class size was improper for H.W. not just based on his reading needs but also his ADHD and related executive functioning deficits. (Tr. 369; Ex. R). The District conceded that H.W.'s inattention, impulsivity, and organizational issues significantly impacted him in the classroom. (Tr. 126). Dr. Fontanetta's testing also demonstrated that H.W.'s "[a]ttention was notably inconsistent; impulsivity and restlessness were evident." (Ex. R, p. 5; Tr. 411).

132. Even in a class of 9 students at Windward with a mentor teacher and a "teacher-in-residence"[5], Ms. Schwartz noted that H.W. required redirection and refocusing, but she and the CSE disregarded how these attentional difficulties would impact him in a much larger general education classroom. (*See* Tr. 64). The District failed to explain how these attentional deficits could be addressed in a large general education classroom. (IHO Dec., pp. 19-20). For example, his proposed IEP notes that H.W. requires "minimal distractions around him" but makes no recommendations as to how distractions could be minimized in a class of more than 20 students. (*See* Ex. B, p. 13).

133. The SRO disregarded cases holding that large class environments are inappropriate for students, like H.W., who are diagnosed with dyslexia and need specialized reading programs. For example, in *Avaras v. Clarkstown*, the court reasoned that a 15:1 class setting was inappropriate for a student with dyslexia." *Avaras*, No. 15 Civ. 2042(NSR), 2017 WL

---

[5] To become a lead, or "mentor," teacher at Windward, teachers must spend two years as "teachers-in-residence," similar to working as an assistant teacher. (Tr. 207-10, 250).

3037402, at *19 (S.D.N.Y. July 17, 2017). The Court noted that the class ratio of 15:1 would not have permitted the level of direct interaction the student needed, and ultimately found a FAPE denial on that basis. *Id*. Here, the recommended large general education class lacks the level of support and direct interaction that H.W. required to address his needs and deficits, including attention and reading needs.

134. The SRO also ignored the IHO's findings regarding Dr. Fontanetta's evaluation and the weight to give her testimony. The IHO specifically held that there were "no grounds to doubt the professionalism of Dr. Fontanetta," who testified that the District's recommended general education program was not appropriate for H.W. (IHO Dec., p. 14; Tr. 368). As noted, deference is due to the IHO's credibility determinations; this is equally true when such determinations are "implicit." *A.B. v. Lawson*, 354 F.3d 315, 327-28 (4th Cir 2004). *See also Scott P.*, 62 F.3d at 524, 528-29; *P.G. v City Sch. Dist. of New York*, 2015 WL 787008, at *16 (S.D.N.Y. Feb. 25, 2015); *M.W.*, 869 F. Supp. 2d at 330; *Bd. of Educ. of Hicksville Union Free Sch. Dist. v. Schaefer*, 84 A.D.3d 795, 796 (2d Dep't 2011)). The Second Circuit has upheld deference to an IHO's credibility determinations in weighing which proffered experts should be afforded the most credence, even when the Court itself had "doubts." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 258 (2d Cir. 2012).

135. The SRO also failed to analyze conflicting testimony, instead selectively citing from evaluations, and deference is not warranted. *See F.O. v. N.Y. City Dep't of Educ.*, 976 F.Supp.2d 499, 514 (S.D.N.Y.2013)(deference not merited where fact-finder "failed to analyze conflicting testimony from any of the Parents' witnesses"); *C.L. v. N.Y. City Dep't of Educ.,* No. 12 CIV. 1676 JSR, 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013), *aff'd*, 552 F. App'x 81 (2d Cir. 2014)(deference not merited where factfinder "gave no explanation for

why it credited the unfounded assertions of a school psychologist who had observed [the student] for only an hour and a quarter over the cogent testimony of multiple highly credentialed teachers who had worked closely with [the Student] for a full school year").

136. For example, the SRO refers only once to Dr. Slonim's Language/Literacy Evaluation of H.W., conducted at a time when he was receiving Wilson instruction in-District. . (*See* Ex. D, p. 4; Tr. 321). The SRO does so solely for the purpose of noting that Dr. Slonim, like the other experts, recommended that H.W. receive "a multisensory approach" to reading instruction. (SRO Dec., p. 18 fn. 21).

137. Despite seemingly finding Dr. Slonim's evaluation valid, the SRO ignores the rest of Dr. Slonim's recommendations and warnings. Dr. Slonim goes on to say that "[H.W.] would benefit from a multisensory approach to reading that importantly takes into account his emotional reaction to failure. That is, he needs **one on one attention** that focuses on what [H.W.] can successfully learn, at the pace he can learn." (Ex. 5, p. 4)(emphasis in original).

138. Overall, the SRO (unlike the IHO) failed to consider all the evidence in the record and as such does not merit deference. *See M.H. v. New York City Dep't of Educ.*, 712 F. Supp. 2d 125, 161 (S.D.N.Y. 2010), *aff'd*, 685 F.3d 217 (2d Cir. 2012).

139. The SRO also improperly disregards the IHO's carefully reasoned decision that H.W.'s special education needs could not be met with Wilson instruction. In making that finding, the IHO made an implicit credibility determination that the evidence provided by M.W. was credible regarding H.W.'s inability to progress using Wilson, and this finding is entitled to deference. (Tr. 314, 321; IHO Dec., p. 16). *A.B.*, 354 F.3d at 327-28. "Although courts should generally defer to the state administrative hearing officers concerning matters of methodology, [an] SRO's failure to consider any of the evidence regarding … methodology

and its propriety…is more than an error in the analysis of proper educational methodology. It is a failure to consider highly significant evidence in the record. This is precisely the type of determination to which courts need not defer." *M.H.,* 685 F.3d at 252; *see W.S.*, 188 F.Supp.3d. at 305.

140. The SRO overlooked other evidence in the record that the IHO considered, such as the concerns relayed to M.W. by the tutors she hired to work with H.W., who were using Wilson with H.W. to no effect. (Tr. 313-14; IHO Dec., p. 16). It is well-settled that hearsay evidence is admissible in IDEA proceedings. *See Jalloh v. Dist. of Columbia*, 535 F. Supp. 2d 13, 202 (D.D.C. 2008); *Sykes v. Dist. of Columbia*, 518 F. Supp. 2d 261, 268 (D.D.C. 2007) (noting, in addition to case law allowing hearsay evidence in administrative hearings, that "the IDEA supports this precedent by not explicitly banning hearsay evidence from administrative proceedings held pursuant to the statute"); *Glendale Unified Sch. Dist. v. Almasi,* 122 F. Supp. 2d 1093, 1101 (C.D. Cal. 2000); *see also Application of the Dep't of Educ.*, Appeal No. 20-080; *Application of the Dep't of Educ.*, Appeal No. 12-075; *Application of a Student with a Disability,* Appeal No. 12-007; *Application of a Child with a Disability*, Appeal No. 03-053; *Application of a Child Suspected of Having a Disability*, Appeal No. 93-018).

141. Unfortunately, Wilson Reading was not appropriate for H.W. (Tr. 313-14, 321-22). Wilson Reading emphasizes techniques such as tapping out syllables that H.W. found distracting and difficult to understand, and the District did not address H.W.'s difficulties with these strategies. (Tr. 321). H.W. required instruction using specialized reading instruction that focused on sensory-based instruction. (Tr. 321).

142. The District also conceded that it used the inappropriate and non-research-based Teachers

College Units of Study program with H.W when he last attended the District program. (Tr. 99). Indeed, Ms. Oliver testified that she used the Journeys program with students, which focuses on reading comprehension and writing, rather than the reading decoding that was H.W.'s primary area of deficit. (*See* Tr. 25, 62, 160; Exs. B, p. 2; 3, p. 6). Journeys is not based on Orton-Gillingham, the evidence-based programming that all evaluators agreed H.W. required. (Ex. 4, p. 9; Tr. 184; *see* Ex. 3, p. 6).

143. Even if Wilson or Journeys had been appropriate, the SRO ignored another significant issue with the District's proposed placement that would deny H.W. a FAPE. Despite the District's retrospective claims at hearing, the proposed IEP recommended that H.W. receive his group reading instruction within the "Classroom," not in a separate location. (Ex. B, p. 16). This would be far too distracting an environment for H.W. to make reading progress in his greatest area of need.

144. The SRO improperly reversed the IHO regarding the District's failure to consider reading methodologies other than Wilson at the June 2022 CSE meeting and made factual errors in her analysis. (SRO Dec., p. 20).

145. For example, the SRO claims that H.W. "received academic intervention services (AIS) reading support in a group that used the Fundations program during the 2021-22 school year" until the June 2022 CSE when it was allegedly recommended that he "engage with the Wilson program," suggesting that the CSE had a reasoned discussion at the CSE meeting about the relative benefits of the Fundations program as opposed to the Wilson program at this meeting. (*See* SRO Dec., p. 20). In support of her contentions regarding H.W.'s 21-22 programming, the SRO cites (among others) the evaluation by Dr. Davidovicz – which was completed during the 2020-2021 school year in March 2021 and could not provide evidence

of what services H.W. received the following year. (*See* Ex. 3). The SRO also cites Dr. Fontanetta's report, seemingly confused by references to H.W.'s second grade year services (which were the recommendations for the 21-22 SY, and therefore began before the June CSE at issue). (*See* Ex. 4, p. 2).

146. In fact, as discussed elsewhere, H.W. began receiving Wilson instruction in mid-2021. (Tr. 313-14, 321). This was not a decision made based on discussions at the June 2022 CSE meeting relevant to this hearing as it was done in 2021, and the SRO's confusion on the timeline calls all of her analysis of H.W.'s alleged progress and needs into question.

147. In assessing the District's failures as a whole, it is clear that the District failed to offer H.W. a FAPE for the 22-23 SY. *See L.O. v. N.Y. City Dep't of Educ.*, 822 F.3d 95, 124 (2d Cir. 2016). Multiple violations "display[ ] a pattern of indifference to the procedural requirements of the IDEA" in which the District "repeatedly violat[ed] its obligation under the statute, which consequently resulted in the deprivation of important educational benefits to which [the student] was entitled by law." *Id*.

148. The SRO erred by ignoring and/or glossing over the significant testimony and evidence demonstrating that the District's IEP and program recommendations would not have been appropriate for H.W., and should be reversed.

149. The SRO erroneously found that the District's IEP was appropriate for H.W. even though it failed to recommend an appropriate class placement, and should be reversed.

150. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the professionals who evaluated H.W. and worked with him had recommended that he be placed in a small class program with appropriate, non-Wilson reading instruction, and should be reversed.

151. The SRO erred by ignoring and/or glossing over the testimony and evidence that the District predetermined its placement for H.W., and should be reversed.

152. The SRO erred by ignoring and/or glossing over the testimony and evidence demonstrating that the District's recommended general education class was inappropriate for H.W.'s needs, lacked sufficient supports to address H.W.'s distractibility and deficits, would cause him to regress, and should be reversed.

153. Overall, the SRO failed to issue a careful and thorough decision, and thus, it is respectfully submitted that this Court should not defer to the SRO's improper determinations.

154. The SRO correctly affirmed that the District failed to properly appeal the IHO's findings on Prong II. (SRO Dec., pp. 6-7 fn. 9). State regulations require the petitioner to use a numbering system to clearly "identify the findings, conclusions, and orders to which exceptions are taken, or the failure or refusal to make a finding" in the request for review. 8 N.Y.C.R.R. § 279.8(c)(2). "[A]ny issue not identified in a party's request for review, answer, or answer with cross-appeal shall be deemed abandoned and will not be addressed by a State Review Officer." 8 N.Y.C.R.R. 279.8(c)(2),(4); *J.S. v. New York City Dep't of Educ.*, 2017 WL 744590, at *4 (S.D.N.Y. Feb. 24, 2017)(holding that "failure to advance specific arguments in support of their conclusory challenge constituted waiver of those issues").

155. Petitioner's request for review only vaguely alleges that the IHO "erred on the law and facts when she held Windward was appropriate" in a single sentence. This statement is too broad to meaningfully challenge any specific findings of the IHO, and Petitioner fails to grapple with the IHO's reasoning or evidence. *See Bd. of Educ. of Harrison Cent. Sch. Dist. v. C.S.,* 2024 WL 4252499, at *13 (S.D.N.Y. Sept. 20, 2024) (finding that "(m)erely asserting that

the IHO" erred in finding that the district did not offer the student a FAPE "does not raise the precise rulings presented for review"); *W.R. v. Katonah Lewisboro Union Free Sch. Dist.,* 2022 WL 17539699, at *9 (S.D.N.Y. IHO Dec. 7, 2022); *Application of the Board Of Educ. of the West Hempstead Union Free School District,* Appeal No. 24-529.

156. It is well settled that a memorandum of law is not a substitute for a deficient pleading, like Petitioner's Request for Review. *See* 8 N.Y.C.R.R. § 279.4, 279.6; *see also Davis*, 2021 WL 964820, at *11; *Application of the Board Of Educ. of the West Hempstead Union Free School District,* Appeal No. 24-529; *Application of a Student with a Disability,* Appeal No. 19-021; *Application of the Dep't of Educ.*, Appeal No. 12-131. Moreover, Petitioner did not advance specific challenges to the majority of the IHO's findings on Prong II even in its Memorandum of Law.

157. The record as a whole demonstrates that M.W. has met the Prong II burden for tuition reimbursement Windward offered H.W. instruction and supports tailored to his unique needs, and that H.W. progressed meaningfully at Windward, as the IHO properly found.

158. The District also failed to appeal any specific findings by the IHO regarding Prong III in its Request for Review or Memorandum of Law, as properly found by the SRO. (SRO Dec., pp. 6-7 fn. 9). The IHO properly found that M.W. cooperated at all times with the District and in no way hindered H.W.'s IEP development, and that the equities favored her and H.W. (IHO Dec., p. 27).

159. The record as whole demonstrated that M.W. cooperated with the District such that equities weigh in M.W. and H.W.'s favor.

### RELIEF SOUGHT

**WHEREFORE,** Plaintiff respectfully requests that this Court:

(a)     Reverse the August 8, 2025, SRO Decision with regard to Prong I;

(b)     affirm the December 14, 2024, IHO Decision in its entirety;

(c)     declare that the District denied H.W. a FAPE for the 2022-2023 school year; that H.W.'s parents have met the applicable Second Circuit standards for reimbursement of unilaterally provided tuition and special education services for H.W. for the 2022-2023 school year; and that the equities favor H.W. and his mother;

(d)     order the District to reimburse M.W. for H.W.'s program at the Windward for the 2022-2023 school year;

(e)     declare H.W. and his mother to be the "prevailing party" for purposes of the IDEA's fee-shifting provision;

(f)     grant leave to Plaintiff's counsel to submit a fee application for purposes of statutory attorneys' fees and other recoverable costs at the administrative impartial hearing level, the SRO level, and in this action, pursuant to the IDEA's fee-shifting provisions; and

(g)     grant Plaintiff such other, further, and different relief as may be just under the circumstances.

Dated: Huntington, New York
       December 8, 2025

                                        /s/

                                        Christina D. Thivierge (CT 9565)
                                        Thivierge & Rothberg, P.C.
                                        Attorneys for the Plaintiff
                                        22 High Street
                                        Huntington, New York 11743

Tel: (212) 397-6360
Fax: (212) 397-6361
*christina@trspecialedlaw.com*